**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MAI-LING MIDDLETON, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | No. 15-1419 |
| Acting Commissioner of the | : | |
| Social Security Administration, | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**

TIMOTHY R. RICE                                        December 8, 2015
U.S. MAGISTRATE JUDGE

Plaintiff Mai-Ling Middleton alleges the Administrative Law Judge ("ALJ") erred in denying her claims for Social Security Income ("SSI") by: (1) failing to find Middleton met the criteria for Listing 12.04 (affective disorders)[1] and to adequately explain that determination; (2) rejecting the opinion of her treating psychiatrist without sufficient explanation; and (3) rejecting her testimony and the testimony of lay witnesses. See Pl. Br. (doc. 11) at 2, 7, 10. I find the ALJ's determination was supported by substantial evidence and that he properly evaluated and explained Middleton's Listings eligibility, medical source opinions, and credibility. I recommend that Middleton's request for review be denied.

---

[1] The Listing of impairments, which is identified in the social security regulations, is used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background. Sullivan v. Zebley, 493 U.S. 521, 532 (1990). The listings define impairments that would prevent an adult, regardless of age, education, or work experience, from performing any gainful activity, not just substantial gainful activity. Id.; 20 C.F.R. § 416.925(a) (purpose of the Listing is to describe impairments severe enough to prevent a person from doing any gainful activity). The Listing was designed to operate as a presumption of disability, making further inquiry unnecessary. Sullivan, 493 U.S. at 532.

PROCEDURAL HISTORY

Middleton filed for SSI benefits on October 20, 2011, alleging disability as of July 13, 2011. R. at 158. Following a hearing, the ALJ denied Middleton's claim in a June 2013 opinion. Id. at 44-51. Applying the five-step sequential analysis,[2] the ALJ determined Middleton had three severe impairments that did not meet or medically equal a Listing: (1) asthma; (2) pain from motor vehicle accident injuries; and (3) mood disorder. Id. at 46. In assessing whether the severity of Middleton's mental impairment met or medically equaled the criteria of Listing 12.04, the ALJ found that her impairments caused only mild or moderate limitations in her activities of daily living, social functioning, and concentration, persistence, or pace, and that she had not experienced any extended episodes of decompensation. Id. at 46-47.

The ALJ found Middleton had the RFC to perform limited light work,[3] discredited her statements as to the severity of her symptoms, and relied on VE testimony to conclude that Middleton could perform past relevant work as a housekeeper/cleaner. Id. at 47-51.

FACTUAL HISTORY

Middleton, 34 years old at the time of the ALJ's decision, lives with her fiancé and has a

---

[2]     The ALJ considers whether a claimant: (1) is engaged in substantial gainful employment; (2) has one or more severe impairments, which significantly limit her ability to perform basic work; (3) has impairments that meet or equal the criteria associated with impairments in the Social Security Regulations so as to mandate a disability finding; (4) has a Residual Functional Capacity ("RFC") to perform work with her limitations and can return to her previous work with that RFC; and (5) can perform any other work existing in the national economy. See 20 C.F.R. § 416.920(a)(4)(i)-(v).

[3]     The ALJ limited Middleton to work that consists of simple, routine tasks where she can avoid contact with the public, and work primarily on her own, not as part of a team. R. at 47. The ALJ also limited Middleton to work where she could avoid exposure to hazards such as unprotected heights and moving machinery, and avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and other environmental irritants. Id.

teenage daughter who lives with relatives in South Carolina.  Id. at 64-66.  She last worked in 2011, cleaning houses for six months.  Id. at 66-67, 199.  She has held many different short-term positions, including work as a cashier, housekeeper, and laborer in a warehouse.  Id. at 66-71, 199.  In 2009, she was arrested for a DUI and was incarcerated for six months.  Id. at 371.  She started smoking cigarettes around age 11 and drinking alcohol at age 12.  Id. at 75, 342.  She has a history of alcohol abuse.  Id. at 75, 353, 365, 372.

Middleton has a long history of asthma,[4] body pain, and mental illness, but her medical records begin only in 2010.  The source of her body pain remains undiagnosed, and it is unclear from the records whether she suffers from a bone disease, see infra at 4-5, 10, 29, the effects of a car accident at age 13, see infra at 5, and/or a neurological disorder, see infra at 5, 28 n.26.

Asthma

Beginning in 2010, Middleton received treatment from Dr. Sarwat Jahan at ChesPenn Family Health Center at Coatesville, primarily for asthma and muscle pain.  Between 2011 and 2013, Middleton reported to Dr. Jahan that her asthma medication was effective in relieving her symptoms, and her asthma and allergy medication was updated accordingly.  Id. at 316, 326, 490-93, 508.  Dr. Jahan, however, noted that her asthma was poorly controlled, id. at 327, 508, "[l]ikely secondary to both cigarette smoking and some compliance issues," id. at 510.

On November 11, 2011, Middleton visited Dr. Robert Hindman, a pulmonary specialist. Id. at 342.  Middleton complained of shortness of breath, coughing, wheezing, chest pain,

---

[4]      Asthma consists of "recurrent attacks of [coughing] and wheezing . . . .  Some cases are allergic manifestations in sensitized persons; others are provoked by factors such as vigorous exercise, irritant particles, psychologic stress, and others."  Dorland's Illustrated Medical Dictionary (32nd ed. 2012) at 168 ("Dorland's").

heartburn, pain in her legs, and hyperventilation.  Id.  Dr. Hindman prescribed medication for her

asthma.  Id. at 343.  She had three follow-up visits for her asthma with Dr. Hindman between

2011 and 2013, during which he advised continued use of an inhaler.  Id. at 405-407.

On December 22, 2011, Dr. Alexander Klufas completed a consultative examination,

during which Middleton reported her main problem was asthma.  Id. at 352.  With regard to her

pulmonary health, Dr. Klufas found normal breath sounds, and no labored breathing or audible

wheezing.  Id. at 355.  He noted that although Middleton has a history of asthma, she visited the

emergency room only once in her lifetime and had no hospitalizations.  Id. at 357.  He

determined environmental factors affect her asthma, including poor ventilation, temperature

extremes, dust, fumes, odors, and gases.  Id. at 350.

On December 20, 2014, Middleton visited the emergency room for an upper respiratory

infection, id. at 29, and her asthma "appear[ed] uncontrolled secondary to compliance issues and

continued smoking," id. at 30.

At the ALJ hearing, Middleton testified she uses inhalers, and a nebulizer machine four

times a day.  Id. at 73.

Body Pain

Middleton contends she is unable to sustain full-time work because of a diagnosed bone

disease in her knees, which prevents her from standing for long periods of time, and because of

leg, back, and arm pain.  Id. at 72, 80.  She testified that she falls "practically all day," sometimes

catching herself and other times falling completely.  Id. at 77.  At the time of the ALJ hearing,

she was learning to use a cane to prevent falling.  Id. at 77, 79.  She also holds on to chairs or

railings around her house to get up or move around, and sometimes crawls.  Id. at 77.  She

attributes some of her body pain to a car accident at age 13, which has caused her to experience muscle spasms and knots in her lower back and shoulders.  Id. at 76, 342.

Middleton stated she also suffers from an undiagnosed nerve impairment, which causes her hands to shake and drop things.  Id. at 80-81.  She experiences a burning sensation off and on that runs through her arms and legs.  Id. at 75.

On September 19, 2011, Middleton visited the Brandywine Hospital Emergency Room for "moderate" lower back and left knee pain.  Id. at 256.  Middleton stated her knee "[kept] giving out on her," id., and a splint was applied, id. at 258.  During a follow-up visit with Dr. Jahan on September 26, 2011, she stated her body pain had worsened during the previous two weeks.  Id. at 322.  She was diagnosed with muscle pain, prescribed a new pain medication, and advised to get a rheumatology evaluation.  Id. at 324.

On November 12, 2011, Middleton visited Dr. Jahan again for back and knee pain.  Id. at 471.  She told the doctor her lower back pain had worsened during the previous seven to eight months.  Id. at 472.  Dr. Jahan noted she had been diagnosed with an unknown bone disease.  Id. Middleton stated the left knee pain had worsened, and she believed the bone disease was developing in her right knee.  Id.  She was prescribed more pain medication, and x-rays were ordered for her back and knees.  Id. at 473-74.

During her December 2011 consultative evaluation with Dr. Klufas, Middleton told him she had been diagnosed with osteoarthritis, but Dr. Klufas noted that her medical records indicated she was diagnosed with Osgood-Schlatter.[5]  Id. at 352.  Middleton described back, knee, shoulder, hand, and wrist pain, and contended her pain stemmed from a childhood accident

---

[5]  An overuse injury usually seen in children that results in a painful bump below the knee.

when she fell off of a rope swing.  Id.  Dr. Klufas noted she did not require or carry a cane, but she stated that she owned two canes and might start using them.  Id.  Although Middleton did not allow adequate examination of her knees because of pain, Dr. Klufas found no swelling, thickening, tenderness, or redness of the joints, and "absolutely no limitation at the neck or low back."  Id.  Dr. Klufas found Middleton to have a full range of motion of the major joints and spine, id. at 345-48, 356, with only a slight limitation at the right thumb, and no limitations in her sitting, bending, standing, walking, lifting, and grasping, id. at 356-67.

Dr. Klufas concluded that Middleton's "rapid motions and ability to stand after squatting in a rather brisk fashion likely demonstrates that the joints are not unstable."  Id.  He noted Middleton had "absolutely no difficulty getting on and off the examination table" and her "hand grasps [were] strong."  Id.  He found her full range of motion and rapid motions involving her knees discredited her allegations of pain.  Id. at 357-58.

Throughout 2012, Middleton visited Dr. Michael Jaworski at Chester County Rheumatology to address her body pain.  Dr. Jaworski diagnosed Middleton with joint and muscle pain.  Id. at 417, 421, 424, 428.  During her visits, Middleton complained of joint and muscle pain, and burning pain in her arms and legs, with on and off symptoms of moderate severity.  Id. at 375, 416, 419, 422, 426.  Dr. Jaworski consistently noted there was no loss of strength, and Middleton's range of motion was full.  Id.  Despite normal musculoskeletal and extremity evaluations, Dr. Jaworski noted a "diffuse tremor" of her upper extremities, id. at 423, 427, 433, and recommended seeing a neurologist.  Id. at 418, 426, 428, 434.

In a March 8, 2012 letter to Dr. Jahan, Dr. Jaworski noted Middleton had "elevated

---

Dorland's at 540, 1343, 1345, 1927.

creatine kinase," "myalgia and weakness," and "a significant tremor." <u>Id.</u> at 429.  He stated she would need to see a neurologist to evaluate her symptoms, an EMG/NCV to evaluate her elevated creatine kinase, and "to see neurology to evaluate for an underlying neuromuscular disorder." <u>Id.</u>

In a March 3, 2013 letter, Middleton's fiancé, Michael Miles, wrote that Middleton began showing more signs of pain in April 2011, and her condition had worsened.  <u>Id.</u> at 412.  He stated she experienced pain in her legs, ankles, and back, as well as shaking of her arms, and noted that "[s]he'll be fine for awhile and then her legs or ankles will give out" so that he has to support her.  <u>Id.</u>  He also stated Middleton often sits crying from pain, her sleep is disturbed by pain, and her "day to day life is usually constant pain." <u>Id.</u> at 412-13.  He noted her attitudes and moods changed often due to her bi-polar disorder, and he believed her ailments triggered each other.  <u>Id.</u> at 413.

In a March 5, 2013 letter, Middleton's brother, Ceciles, wrote that Middleton's leg, back, and ankle pain had worsened over the last few years, and she has trouble standing for long periods of time.  <u>Id.</u> at 414.  He noted that she often has to use a cane,[6] and has weakness in her hands that causes her to lose her grip.  <u>Id.</u>  Middleton's mother's letter of the same date notes Middleton complains of severe pain, her legs buckle at times, and she shakes while walking.  <u>Id.</u> at 415.  She also notes that things fall out of Middleton's hands, and that the source of her pain is still unknown.  <u>Id.</u>

---

[6]     At the ALJ hearing nine days later, Middleton had a cane with her, and testified that she had gotten it the week before and was still learning how to use it.  R. at 77, 79.

Mental Impairments

Middleton testified that her bipolar disorder[7] causes her to black out, or become angry or depressed.  Id. at 73.  She testified that if things are not done her way, she might "snap," id. at 77, but her increased dosage of Depakote[8] has been helping, id. at 73-74.   The last time she blacked out was two months before the ALJ hearing.  Id. at 81.

During his December 2011 consultative evaluation, Dr. Klufas found Middleton's mental status "highly abnormal."  Id. at 357.  When Middleton sat down in the examination room, she "started stomping her feet getting up, screaming rather loudly various vulgar expletives."  Id. at 351.  When Dr. Klufas performed measurements of Middleton's extremities, Middleton "got upset . . . and [screamed] several vulgar expletives."  Id. at 357.  He believed her mental impairment was "much more complicated" than simply bipolar disorder, and he advised a formal exam.  Id.  He wrote, "Curiously, other than Depakote, she is apparently on no other mental health medications."  Id. at 353.

When Dr. Klufas inquired about past hospitalizations, Middleton reported she was admitted to the Brandywine Hospital Psychiatric Ward sometime between 2004 and 2006 after an attempted suicide.  She also said she had tried to drink herself to death, but then called 911 and spent 30 days in the psychiatric unit.[9]  Finally, Dr. Klufas noted Middleton's history of

---

[7]     Individuals with bipolar disorder experience alternating manic episodes, in which "there is an abnormally and persistently elevated, expansive, or irritable mood," and major depressive episodes, in which "there is either depressed mood or the loss of interest or pleasure in nearly all activities."  Diagnostic and Statistical Manual of Mental Disorders IV-TR ("DSM-IV") 349, 357, 382 (4th ed. Am. Psychiatric Assoc. 2000).

[8]     Depakote treats manic episodes associated with bipolar disorder.  Dorland's at 490, 558.

[9]     Middleton submitted no medical records of these hospitalizations.

alcoholism[10] and noticed a "strong odor of alcohol on her breath."  Id. at 358.

On February 8, 2012, William Waid, Ph.D., evaluated Middleton, and found her ability to understand, remember, and carry out instructions moderately limited by her mental impairment, which he noted was "highly variable, fluctuating."  Id. at 368.  He found her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting also was moderately limited by her impairment.  Id.

Middleton complained to Dr. Waid of being awake from pain much of the time.  She told Dr. Waid she "[knew] things before they happen[ed]" and "read people's minds," and saw shadows and heard voices that said "hurt him first."  Id. at 371.  She also acknowledged her outbursts against her fiancé, during which she screams, strikes out, hits him, and cuts herself.  Id. She reported that a couple of times per week she strikes herself to end racing thoughts and pressure in her head, and cries when angry or sad.  Id.

Dr. Waid noted the discrepancy between his evaluation and that of Dr. Klufas: "The pleasant, calm, but rather simple-minded woman seen today could be a different person from the claimant examined by Dr. Klufas in November 2011."  Id. at 372.  Dr. Waid opined the "markedly different presentation," including an "entire spectrum of multiple physical and pain complaints and exaggerations," could be due either to "acting out in Dr. Klufas' office with her brother available to testify about her similar behaviors out of the office," which had "the aura of a staged active malingering," or to "a somatization disorder."[11]  Id. at 373.

---

[10]     Between December 30, 2010 through May 31, 2011, Middleton participated in alcohol outpatient treatment in Coatesville, PA.  Id. at 365.  She met individually and as a group once a week, and in her January 31, 2012 Treatment Status Report, her prognosis was "good."  Id.

[11]     In psychiatry, somatization is the conversion of mental experiences or states into bodily

9

Dr. Waid diagnosed Middleton with bipolar disorder with "psychotic features, alcoholism and alcohol abuse"[12] and "moderate to severe effects of psychological condition and alcoholism." Id. at 372.  He noted "[r]ule out somatization disorder" and "[r]ule out mixed personality disorder." Id.  He also noted she had "[m]ultiple medical complaints, no supporting data available." Id.  He assigned her a Global Assessment of Functioning ("GAF")[13] score of 52. Id. at 372.

Beginning in April 2012, Middleton visited Human Services, Inc. for mental health treatment, where she saw Dr. Althea Donovan for psychiatric evaluations and met with Margot Presto, MS, for bi-weekly counseling sessions to address her depression and anger.  Id. at 550. During her initial evaluation, Middleton reported: depression, psychosis, self-injury, aggression, sleep disturbance, eating disturbance, and "hard to focus at times." Id. at 394.  Middleton told the doctor her "bipolar is out of control," and that she "sees shadows," "hears voices," and has "racing thoughts." Id.  She was provisionally diagnosed with bipolar disorder, alcohol abuse, as well as " 'bone disease,' [rule out] neurological problem, asthma." Id. at 401.

---

symptoms. Dorland's at 1734.

[12]    Middleton told Dr. Klufas in December 2011 she drank three to four 16-ounce beers during the weekend and that she was alcohol addicted.  R. at 353.  She told Dr. Waid she had not been intoxicated in years and drinks only at home to avoid DUIs.  Id. at 372.  Dr. Waid noted Middleton's inconsistent reports of alcohol use, although she "continued to deny that [it is] a current problem." Id.  at 373.

[13]    GAF scores (on a 100-point scale) reflect the mental health specialist's assessment on a particular day of the severity of a patient's mental health, and are based on the patient's state of mind and symptoms.  DSM-IV at 34.  A GAF score of 51 through 60 indicates moderate symptoms, such as circumstantial speech and occasional panic attacks or moderate difficulty in social or occupational functioning, i.e., few friends or conflict with peers or coworkers.  Id.  GAF scores have not been included in the most recent DSM, published in 2013, due in part to their "conceptual lack of clarity" and lack of validity.  DSM-V at 16.

During a June 20, 2012 evaluation, Dr. Donovan observed Middleton was "somewhat restless, but cooperative," and had a "goal-directed" thought process. Id. at 389. Middleton denied delusions and hallucinations. Id. at 390. Dr. Donovan found her alert, oriented, and cognitively intact, but with poor insight and judgment. Id. She assigned Middleton a GAF score of 45.[14] Id. Dr. Donovan noted Middleton's history of physical aggression, including previously stabbing an ex-boyfriend and more recently superficially cutting her boyfriend, and the recent increases in her irritability, and decided to "start treatment with Depakote immediately." Id. She further diagnosed Middleton with PTSD and "[rule out] Personality Disorder." Id. at 390.

On October 10, 2012 and January 21, 2013, Dr. Donovan described Middleton as "stable," with appropriate affect, logical and goal directed thought, adequate sleep, cooperative interaction, adequate social skills, and no hallucinations or delusions. Id. at 385, 387. Dr. Donovan assigned Middleton a GAF score of 48 on both dates. Id. at 386, 388.

During counseling sessions, Ms. Presto continually described Middleton's depression as not bad. Id. at 531, 542, 544, 547. Middleton attributed any depression to her lack of work and desire to have something to do. Id. at 542, 544-45. However, Middleton was "happy" and "excited" when she had job prospects or secured work. Id. at 531.

Middleton's anger was more severe, but was almost always triggered by her boyfriend, who did things that irritated her and caused her to "get[] a feeling [and] act[] out." Id. at 531, 533, 542, 544. On several occasions, Middleton had outbursts, throwing things at home, often at her boyfriend. Id. at 531, 544, 547. On February 19, 2013, Ms. Presto noted Middleton's anger

---

[14]    A GAF score in the range of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.

had not been a problem lately, as her "[boyfriend had] not been getting on her nerves," id. at 538, but on March 7, 2013, Middleton was described as "easily angered [with her boyfriend because] of things he does which irritate her," id. at 533.  Middleton stated her medication helped her anger when she remembered to take it, but "[s]ometimes [she] feels . . . OK [and] doesn't need meds." Id. at 547.  She also admitted forgetting to take her medication at times.  Id. at 548.

Middleton told Ms. Presto she was actively seeking a job, and was at times working.  On October 2, 2012, Ms. Presto noted Middleton was recently hired as a high school food preparer, would be starting the following week, and was very excited about the job.  Id. at 531.  On October 16, 2012, during a counseling session, Ms. Presto noted Middleton could only stay for half-an-hour because of a second job interview with Giant, and was waiting to hear from the high school about the food preparation job, which she was "really hoping [would] come through."  Id. at 547.  On December 20, 2012, Middleton told Ms. Presto she had applied to "numerous places but no one calls [me] back," she was "upset that she can't find a job," and she planned to apply for a job at McDonald's.  Id. at 542.  On November 27, 2012, Middleton told Ms. Presto if she had a car, she would clean houses.  Id. at 544.  On February 19, 2013, Middleton cancelled an appointment because she had obtained a painting job.  Id. at 536.

Throughout 2012, Dr. Jaworski, Middleton's rheumatologist, consistently described normal health in the areas of "neuro," and "psych."  Id.  at 376, 417, 419, 423, 427.  Middleton reported no hallucinations, anxiety, depression, or delusions, and Dr. Jaworski consistently described her as "awake, alert, and oriented," with an appropriate "mood and affect."  Id.

On March 18, 2013, Dr. Donovan completed a Medical Source Statement, in which she found Middleton had extreme limitations in the ability to: maintain attention and concentration

for extended periods of time; work in coordination with or proximity to others without being distracted by them; and complete a workweek without interruptions from psychological-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Id. at 551.  Dr. Donovan found Middleton had marked limitations in the ability to: understand and remember detailed instructions; carry out detailed instructions; sustain ordinary routine without special supervision; complete a normal workday without interruptions from psychologically-based symptoms; interact appropriately with the general public; and set realistic goals and make plans independently of others.  Id. at 551-52.  Dr. Donovan noted Middleton "has racing thoughts . . . poor concentration, mood swings, [and] verbal altercations."  Id. at 552. She further noted she could not add an antipsychotic "due to elevated creatinine kinase and . . . neuromuscular disease."  Id.  She assigned Middleton a GAF score of 46.  Id.

Daily Activities

On November 6, 2011, Middleton's fiancé, Michael Miles, filled out a Third Party Function Report, id. at 207-214, and on November 11, 2011, Middleton filled out a report with very similar answers, id. at 215-22.  Miles stated Middleton's back pain "sometimes lasts for days leaving her bedridden" and her bipolar disorder makes her "act out spontaneously and [ir]ately."  Id. at 207.  Middleton was "able to care for herself but the pain limits her daily activities," as "her legs often give out and walking leaves her breathless at times from asthma." Id. at 208.  Middleton stated that she wakes up five to seven times almost every night due to pain.  Id. at 216.

Both Middleton and Miles asserted that Middleton: travels by walking, car, and public transportation; shops for food and clothes in stores; and pays bills, counts change, and handles a

13

savings account.  Id. at 210, 218.  They stated that she mostly stays in the house and only goes

out to appointments, for which she only sometimes needs company.  Id. at 211, 218-19.  During

the day, she watches television, and she cooks, cleans, and does laundry "when she can," id. at

209, 216-17, and also tries to read "almost every day."  Id. at 219.  Miles described her interests

as "music, movies, and reading," although her "reading isn't that good" and she "[d]oesn't read

that much anymore."  Id. at 211.

Middleton stated she prefers to be "alone or solitary," due to her bipolar disorder.  Id. at

219.  Middleton and Miles noted that she finishes what she starts and follows spoken instructions

well, but does not handle stress or changes to routine well.  Id. at 213, 220-21.  Miles also noted

she gets along well with authority figures, and has never lost a job due to problems getting along

with others.  Id. at 213.  Middleton concluded, "I can get around most days but I have problems

with my legs and back giving out or collapsing."  Id. at 222.

At the ALJ hearing on March 14, 2013, Middleton testified that she spends her time at

home watching television, as well as cooking, which takes her a long time because she has to

stop to sit down every three to four minutes.  Id. at 74, 80.  Middleton has never had a driver's

license.  Id. at 64.  She takes the bus approximately twice a month, and had recently taken a train

at the time of the ALJ hearing.  Id.  She leaves the house once a month to go grocery shopping,

accompanied by her fiancé or his mother, and walks to the store next door to buy the newspaper.

Id. at 78.  She testified that "every now and then" she goes to church or out to eat.  Id. at 79.  She

smokes five cigarettes a day and drinks alcohol only occasionally on weekends.  Id. at 75.

Middleton's mother-in-law, Sandra Miles, testified that she saw Middleton two or three

times per week.  Id. at 82.  Ms. Miles stated she did not have to help Middleton with

14

housekeeping because she was a "very good housekeeper," but that she helped her shop for

groceries.  Id. at 82-83.  Ms. Miles testified that Middleton has fallen three times in her presence,

including twice when Middleton passed out and Miles had to help revive her.  Id. at 83.

Middleton has cried only once in Ms. Mile's presence, after a fainting episode.  Id. at 84.

## DISCUSSION

A claimant is disabled if she is unable to engage in "any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  20 C.F.R. § 416.905; see also Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 503

(3d Cir. 2009).  A "medically determinable physical or mental impairment[]," must be

established "by medical evidence consisting of signs, symptoms, and laboratory findings."  20

C.F.R. §§ 416.905(a), 416.908.  Such impairment cannot be based solely on a claimant's

statement of symptoms.  Id. § 416.908.  Instead, the ALJ must consider all evidence in the record

and explain his reasoning.  See id. §§ 416.920(a)(3), 416.927(c).  Any relevant evidence that is

discounted must be specifically addressed.  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121

(3d Cir. 2000).   Evidence cannot be rejected "for an incorrect or unsupported reason."  Zirnsak

v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014).

I must accept all the ALJ's fact findings if supported by substantial evidence, that is,

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 390 (1971); see also 42 U.S.C. § 405(g).  I "review the

record as a whole to determine whether substantial evidence supports a factual finding," Zirnsak,

777 F.3d at 610, but I may not re-weigh the evidence or substitute my own conclusions for those

15

of the ALJ.  Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011).  Credibility

determinations are reserved for the ALJ.  20 C.F.R. § 416.929; Van Horn v. Schweiker, 717 F.2d

871, 873 (3d Cir. 1983).  I must, however, conduct a "plenary review" of the ALJ's legal

conclusions.  Payton v. Barnhart, 416 F. Supp. 2d 385, 387 (E.D. Pa. 2006).  Thus, I can overturn

an ALJ's decision for a legal error even if I find it was supported by substantial evidence.  Id.

     I.     Failure to Satisfy a Listing and Provide Adequate Explanation

Middleton claims the ALJ improperly determined she did not satisfy the requirements for

Listing 12.04 for affective disorders.  Pl.'s Br. at 2.

To satisfy a Listing, a claimant's impairment must meet all of the specified medical

criteria.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  "An impairment that manifests only

some of those criteria, no matter how severely, does not qualify."  Id.; Jones v. Barnhart, 364

F.3d 501, 504 (3d Cir. 2004).  A claimant must offer medical findings showing her impairments

meet or medically equal a listed impairment.  Burnett, 220 F.3d at 120 n.2; see also Poulos v.

Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007) (claimant bears burden of establishing steps

one through four).

To satisfy Listing 12.04 for affective disorders, Middleton must meet the requirement of

Part A and two of the four categories in Part B: (1) marked impairments in the activities of daily

living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in

maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation,

each of extended duration[15] (or Part C, which is not at issue here).  20 C.F.R. Pt. 404, Subpt. P.,

---

[15]    The ALJ found Middleton had not experienced episodes of decompensation of extended
duration, and Middleton does not contest this finding.  R. at 47.

16

App. 1, § 12.04.  The ALJ is required to provide more than a conclusory statement that a claimant does not meet a Listing.  Fargnoli v. Massanari, 247 F.3d 34, 40 n.4 (3d Cir. 2001); Burnett, 220 F.3d at 120 (ALJ should include "analysis of whether and why [the claimant's] . . . impairments . . . are or are not equivalent in severity to one of the listed impairments").  The ALJ denied Middleton's claim because her Part B limitations were only mild or moderate, not more extreme, i.e., marked.[16]  R. at 47-48.

Middleton claims marked limitations in three categories: (1) activities of daily living; (2) social functioning; and (3) maintaining concentration, persistence or pace.  Pl.'s Br. at 4, 6.  She further contends that the ALJ did not accurately portray the record in her description of Middleton's abilities and limitations, or accurately characterize those limitations as mild and moderate, and provided inadequate explanation of her findings for each category.  Id. at 3-6.  I disagree.

With regard to daily activities, the ALJ found only mild restrictions "as [Middleton] is able to take care of her personal needs without assistance, do various household chores including cooking, cleaning, and laundry, and use public transportation independently."  R. at 47.  To support her finding, the ALJ cited the reports completed by Middleton and her fiancé, her treatment records at Human Services, Inc., and the opinion of Dr. Waid.  Id.

Middleton argues the ALJ mischaracterized the function reports, which state that Middleton could perform household chores only "sometimes" or "when she can," and that she

---

[16]     A "marked" limitation "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(C).

17

can only go out alone or use public transportation "sometimes."  Pl.'s Br. at 4.  Those limitations,

Middleton argues, are more severe than those found by the ALJ.  Id.  Even if the ALJ credited all

of Middleton's assertions, however, substantial evidence supported his finding of only mild

limitations.  Middleton and her fiancé acknowledged in their reports that Middleton prepares

meals daily,[17] id. at 209 ("every other day or daily"), 217 ("daily if I can"), and is able to take

care of personal needs, id. at 208, 216, perform household chores except when she is in too much

pain, id. at 209, 216-17, and to go out alone except when her legs give out and she needs

assistance, id. at 210-11, 218.  They failed to specify how often Middleton is limited in

performing those daily activities, which further supports the ALJ's finding.

　　　　As Middleton acknowledged, her primary concern is her physical impairments, id. at

217-19 (meal preparation, house cleaning, and other activities depend on how legs and back

feel), while the only mention of her mental disorder in her report is her anti-social behavior, id. at

219-20.  Although the record is replete with complaints relating to physical pain, which is not at

issue here when considering whether Middleton met the listing for affective disorder, medical

records and Middleton's testimony reflect her mental health varied but was controlled, and

sometimes improving, with therapy and medication.  See id. at 335, 340, 350.  The evidence

justified the ALJ's finding of only mild limitations in the activities of daily living.

　　　　Similarly, substantial evidence justified the ALJ's determination of Middleton's moderate

level of social functioning.  In addressing the Listing, the ALJ noted Middleton's "problems with

anger have been under reasonable control."  Id. at 47.  Although Middleton argues social

---

[17]　　　　Middleton also repeatedly told her counselor, Ms. Presto, that she likes to cook and clean.
R. at 544, 548.

functioning involves more than keeping anger under control, Pl.'s Br. at 5, the ALJ cites to her self-reports and psychiatric notes and evaluations to support his finding.  R. at 47.

Middleton reported that her bipolar disorder causes her to prefer to be by herself, and she does not handle stress or changes well, id. at 221, but also acknowledged she was able to shop and use public transportation, id. at 218.  At the time of the ALJ hearing, she was engaged to be married.  Id. at 63, 207.  During his consultative evaluation of Middleton, Dr. Waid described her as "pleasant" and "calm," id. at 372, and found her ability to carry out instructions and interact appropriately with supervisors and co-workers only "moderately" limited,  id. at 368.

Middleton's psychotherapy records paint a similar picture.  Dr. Donovan consistently described Middleton as neat, clean, appropriate in appearance, cooperative,[18] alert, and oriented. Id. at 389-90, 399.  During the more recent psychiatric evaluations in 2012 and 2013, Dr. Donovan described Middleton as "stable," with "cooperative interaction" and "adequate social skills."  Id. at 385, 387.  Middleton's anger was limited to her boyfriend, and reported outbursts occurred in her home.  Id. at 531, 533, 542, 544.  Ms. Presto[19] noted Middleton had never lost a job due to anger, id. at 532, and medication controlled Middleton's anger.  Id. at 547-48.

Middleton argues that limitations noted in the record suggest at least a marked

---

[18]    "The ability to get along, communicate clearly, and cooperate with others are examples of strengths in social functioning."  Parks v. Comm'r of Soc. Sec., 401 F. App'x 651, 654 (3d Cir. 2010)

[19]    Medical sources whose opinions cannot establish the existence of an impairment can still provide opinions as to the severity of an impairment established with other evidence.  20 C.F.R. § 416.914(d)(1).  Opinions of these medical sources, which include therapists, id., are evaluated under the same guidelines as other medical source opinions, id. at § 416.927(c); see also S.S.R. 06-03p, 2006 WL 2329939, *3 (August 09, 2006) ("Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.").

impairment in social functioning, including: 1) the fact that she can only go out alone sometimes, demonstrating a "major restriction on her ability to interact independently,"  and (2) Dr. Donovan's report that Middleton has extreme impairment of the ability to work in coordination with or proximity to others without being distracted by them, and to have marked impairment of the ability to interact appropriately with the general public.  Pl.'s Br. at 6.  Middleton's ability to go out alone "sometimes" factors into the degree of limitation of her functioning, which the ALJ was permitted to weigh.  See Parks v. Comm'r of Soc. Sec., 401 F. App'x 651, 654 (3d Cir. 2010) ("a marked limitation in social functioning requires consideration of the nature and overall degree of interference with function").  Further, the ALJ properly assigned Dr. Donovan's opinion limited weight, discussed infra (Discussion Part II), and, therefore, rejected her opinion that Middleton suffers from extreme impairments in social interaction.  See id. at 50.

The ALJ also had substantial evidence to support his finding that Middleton had moderate limitations in concentration, persistence, and pace.  The ALJ noted "psychotherapy notes show that her depressive symptoms have decreased (including looking for . . . work in 2012), and she has been able to handle her own finances, read, and watch and follow television programs."  Id. at 47.

Middleton's psychiatric treatment notes support the ALJ's findings.  Dr. Donovan consistently described Middleton as alert, oriented, and cognitively intact, with logical and goal-directed thought.  Id. at 385, 387, 390.  On June 20, 2012, Dr. Donovan described Middleton as "a casually dressed female with good eye contact who was somewhat restless at times, but cooperative.  Her speech was clear but pressured, with the ability to interrupt."  Id. at 389.  As the ALJ noted, Middleton actively searched for work in 2012.  Id. at 387, 542, 544-45, 547.  In

late 2012, Middleton told her counselor she had applied for a variety of jobs, including as a food preparer at a high school, and at Macy's, Giant, and Toys R Us. Id. at 542, 544. She had two interviews at Giant, and a phone interview with Macy's. Id. at 544, 547. Further, on February 19, 2013, Middleton cancelled her appointment with Ms. Presto because she had a painting job. Id. at 536.

Dr. Waid's consultative examination further supports the ALJ's finding. Dr. Waid noted Middleton "handles her own money, pays her bills, looks at the newspaper at times, [and] goes shopping for necessity." Id. at 372. He found her cognitive function grossly intact, and only moderate limitations in her ability to understand, remember, and carry out instructions. Id. at 368, 372.

Middleton and her fiancé's function reports also support the ALJ's finding. As the ALJ noted, Middleton handles her own finances, id. at 210, 218, listens to music, watches movies and television, and makes an effort to read every day. Id. at 211, 219. Although Middleton argues the ALJ did not accurately describe her reading limitations, and that her reading does not demonstrate her ability to concentrate, Pl.'s Br. at 6, the ALJ was permitted to consider her reading as only one of several factors. See Parks v. Comm'r of Soc. Sec., 401 F. App'x at 655 (ALJ correctly found the ability to read, watch television, and play video games required a degree of concentration, persistence, or pace); see also Haines v. Colvin, No. 14-833, 2015 WL 5559926, at *4 n.3 (W.D. Pa. Sept. 21, 2015) (ALJ finding did not hinge on one factor to the exclusion of others).

The ALJ adequately explained his finding that Middleton did not meet the requirements for Listing 12.04 by sufficiently reviewing the record and considering the appropriate factors.

See Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) ("ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that Jones did not meet the requirements for any listing").

Because the ALJ supported his determination that Middleton suffered only mild and moderate impairments with substantial evidence, his finding that she was unable to meet the Paragraph B criteria of Listing 12.04 was similarly supported.

II.     Failure to Properly Weigh the Treating Physician's Opinion

Middleton argues the ALJ improperly rejected the opinion of her treating psychiatrist, Dr. Donovan.  Pl.'s Br. at 7-10.

Treating physicians' opinions are entitled to "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the case.  20 C.F.R. § 416.927(c)(2). Otherwise, they are assessed based on the "length of the treatment relationship and the frequency of the examination," the "nature and extent of the treatment relationship," the opinion's "supportability," the opinion's "consistency" with the record as a whole, the opining physician's "specialization," and other factors like the opining physician's familiarity with the standards of the Social Security program.   Id. § 416.927(c)(2)–(6).   Opinions from a non-treating source[20] also are entitled to significant weight, but generally not as much weight as a treating source's opinion.[21]  Id. § 416.927(c)(1)-(2); Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir. 1994).  The final

---

[20]     Non-treating sources are usually doctors who have examined the claimant, but have no ongoing treatment relationship.  20 C.F.R. § 416.902.  A source is non-treating if the claimant visits her solely to obtain a report for her claim.  Id.

[21]     A non-treating source opinion is assessed using the factors in 20 C.F.R. § 416.927(c)(2)–

responsibility for making any decision that is dispositive of a case is reserved to the Commissioner.[22]  Id. at § 416.927(d).

The ALJ found Dr. Donovan's opinion inconsistent with the Human Services, Inc. psychotherapist records.  R. at 50.  A review of the psychiatric records supports the ALJ's finding.  Moreover, Dr. Donovan's opinion is a "checkbox opinion," which the Third Circuit considers weak evidence.  See Schmidt v. Comm'r of Soc. Sec., 465 F. App'x 193, 197 (3d Cir. 2012) (evidentiary weight and credibility of form reports is questionable); Mason v. Shalala, 944 F.2d 1058, 1065 (3d Cir. 1993).

Dr. Donovan opined Middleton had an extreme limitation in her ability to maintain attention and concentration for extended period of times.  Id. at 551.  However, she described Middleton as someone "with good eye contact who was somewhat restless at times, but cooperative."  Id. at 389.  Another Human Services, Inc. representative described Middleton as "attentive," id. at 398.

Dr. Donovan found Middleton had marked limitations in her ability to understand, remember, and carry out detailed instructions, and to sustain ordinary routine without special supervision.  Id. at 551.  However, in their reports, Middleton stated that she followed spoken instructions well, id. at 220, and her fiancé stated Middleton followed written instructions "well most times," followed spoken instructions depending on "whether she understands," and gets along with authority figures well.  Id. at 212-13.

---

(6).

[22]    Dispositive issues include "whether your impairment(s) meets or equals . . . any Listing(s)," "your residual function capacity," "the application of vocational factors," and a final determination of disability.  20 C.F.R. § 416.927(d)(2).

Dr. Donovan also opined Middleton had an "extreme" limitation in her ability to "work in coordination with or proximity to others without being distracted by them," and a "marked" limitation in her ability to "interact appropriately with [the] general public."  Id. at 551.  At the same time, Dr. Donovan consistently found Middleton  had adequate social skills and was cooperative.  Id. at 385, 387.  Furthermore, the ALJ accounted for such limitations in the RFC when she limited Middleton to jobs that allow her to "avoid contact with the public" and "work primarily on her own, not as part of a team."  Id. at 47.

Dr. Donovan also found Middleton had a "marked" limitation in her ability to set realistic goals and make plans independently of others.  Id.  at 552. Yet Middleton's initial evaluation with Human Services, Inc. cites Middleton's thought process as "racing" but also "goal directed" and "logical."  Id. at 399.  It also noted "fair" insight and judgment, and that Middleton's recognition of her problem was "very aware."  Id.  In subsequent psychiatric evaluations, Dr. Donovan concurred, consistently finding Middleton's thoughts were "goal directed" and "logical."  Id. at 385, 387, 389.  Furthermore, Middleton's counselor, Ms. Presto, noted Middleton's desire to work but her difficulties in getting hired due to both her lack of driver's license and DUI conviction.  Id. at 542, 544-45.  Middleton told Ms. Presto she wanted a job in order to "get out of the house" and to "have money for herself."  Id. at 544.  Her counselor noted Middleton wanted "to feel productive."  Id. at 545.

The ALJ credited the opinion of consultative psychologist Dr. Waid, id. at 47, 50, who found only moderate mental functional limitations.  Id. at 368.  Middleton argues the ALJ failed to explain why she credited Dr. Waid's opinion over Dr. Donovan's opinion.  Pl.'s Br. at 10.  However, the ALJ explained why she discredited Dr. Donovan's opinion, see supra at 23, and

found Dr. Waid's opinion consistent with other substantial evidence in the record.  R. at 47.  The ALJ was permitted to credit Dr. Waid's opinion while rejecting Dr. Donovan's opinion.  See 20 C.F.R. § 416.927(c) (treating source's opinion may not be given controlling weight if inconsistent with other substantial evidence); Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986) (where treating physician's opinion conflicts with non-treating physician's opinion, ALJ may reject treating physician's opinion if he provides adequate explanation).

The ALJ stated: "The psychotherapist records show [Middleton] looking for work, do not suggest she would be unable to work, and suggest that the reason she did not get work may be due to her history of DUI, not her mental impairment."  Id. at 50.  Although Middleton argues that merely looking for work does not mean she was capable of performing that work, Pl.'s Br. at 9, the ALJ was permitted to factor job searching into his credibility analysis.[23]  See Ford v. Barnhart, No. CIV.A. 06-0220, 2006 WL 3589046, at *3 (E.D. Pa. Dec. 8, 2006) (ALJ properly gave less weight to claimant's reports of pain because she had been applying for jobs).

Middleton also argues the ALJ's statement that Middleton "does have a history of altercations but the psychotherapy records indicate that she has recently been doing reasonably well with her temper except for incidents with her 'stupid' boyfriend," R. at 50, does not

---

[23]     Middleton also contends the ALJ erred in rejecting Dr. Donovan's opinion because there were several observations of Middleton's "racing thoughts" in the record.  Pl.'s Br. at 9.  The ALJ stated: "I do not see anything suggesting the 'racing thoughts' that her psychiatrist gives as a reason for disabling limitations."  R. at 50.  Although Middleton is correct that there are other mentions of racing thoughts in the medical records—in Dr. Donovan's June 20, 2012 evaluation of Middleton and in another Human Services, Inc. examiner's evaluation on April 13, 2012, id. at 394, 399—this statement alone constitutes harmless error, see, e.g., Perkins v. Barnhart, 79 F. App'x 512, 515 (3d Cir. 2003) (harmless error where there is no effect on ALJ's decision).  Furthermore, as the Commissioner notes, Dr. Donovan failed to explain how racing thoughts impact any functional limitation.  See Resp. at 16 n.8.

contradict Dr. Donovan's opinion.  Pl.'s Br. at 9.  Under "General Functional Capacity

Assessment," Dr. Donovan wrote "verbal altercations."  R. at 552.  However, the evidence is of

verbal altercations with only Middleton's boyfriend, and as the ALJ noted, Middleton's

psychiatric records show a general improvement in her mood swings.[24]  Id. at 386, 537, 542, 548.

In any event, the ALJ accounted for any potential limitation due to Middleton's temperament by

limiting her to solitary work.  See id. at 47.

The inconsistency of the psychiatric treatment notes and opinion of Dr. Waid with Dr.

Donovan's findings of severe impairment constitute substantial evidence to support the ALJ's

rejection of Dr. Donovan's opinion.

III.     Failure to Support Adverse Credibility Finding with Substantial Evidence

Middleton contends the ALJ failed to support or provide explanation for her adverse

credibility determination regarding Middleton and other lay witnesses.  Pl.'s Br. at 10.

I must defer to the ALJ's credibility determinations based on the ALJ's ability to observe

the claimant's demeanor.  Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).  The reasons

supporting credibility findings, however, must be substantial and bear a legitimate nexus to the

findings as demonstrated by inconsistent statements, contradictory evidence, or inherently

improbable testimony.  Id.; accord St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d

Cir. 2005) (credibility determinations should not be reversed unless "inherently incredible or

patently unreasonable" as long as the ALJ considers all relevant factors and explains her

---

[24]     Furthermore, Ms. Presto's treatment notes indicate Middleton's anger is better controlled when she remembers or chooses to take her medication, but that when Middleton feels good she does not take her medication.  R. at 547; see 20 C.F.R. § 416.930(b) (no finding of disability where claimant does not follow prescribed treatment).

decisions).  If supported by substantial evidence, the ALJ's credibility findings may not be disturbed on appeal.  Hirschfeld v. Apfel, 159 F. Supp. 2d 802, 811 (E.D. Pa. 2001).

The ALJ found Middleton and her mother-in-law, Sandra Miles, were "not entirely credible" regarding the intensity, persistence, and limiting effects of Middleton's symptoms, and based this on six findings: (1) Middleton's "amorphous complaints of musculoskeletal pain" were unsupported by objective findings and treated with only conservative treatment and no pain management program; (2) Middleton's asthma, treated with medication, "would be more effective if she would stop smoking tobacco and be more compliant with treatment";[25] (3) a lack of follow-up for the finding of elevated creatine kinase; (4) Middleton's active search for a job and records suggesting the reason she was unable to work was her DUI; (5) medical records indicating her temper had been under control; and (6) her activities of daily living.  R. at 50-51. The ALJ's finding merits deference.

Middleton first argues the ALJ may not reject testimony about the intensity of symptoms of pain solely due to the lack of objective supporting medical evidence.  Pl.'s Br. at 10-11 (citing 20 C.F.R. § 404.1529(c)(2) ("we will not reject . . . statements about the intensity and persistence

---

[25]      Middleton's non-compliance is a valid basis on which to assess her credibility.  20 C.F.R. § 416.930 (claimants that are non-compliant without good reason will be found not disabled); SSR 96-7p, 1996 WL 374186, at *7 (S.S.A) ("individual's statements may be less credible . . . if the medical . . . records show that the individual is not following treatment as prescribed and there is no good reason for this failure"); Hagan v. Colvin, No. 13-6092, 2015 WL 3970890, at *4 (E.D. Pa. June 29, 2015) (credibility finding supported by substantial evidence where claimant demonstrated poor compliance with treatment).  However, although the Record is replete with medical records regarding the treatment of Middleton's asthma, Middleton claims her functional limitations are primarily due to her body pain and mental impairments.  To the extent she contends disability from her asthma, the ALJ accounted for such limitations in the RFC by limiting her work to that which avoids concentrated exposure to fumes, odors, dusts, gases, poor ventilation and other environmental irritants.  R. at 47.

of . . . pain or other symptoms or about the effect . . . symptoms have on [the] ability to work solely because the available objective medical evidence does not substantiate [the] statements")); Social Security Ruling 96-7p).  Middleton's lack of medical treatment is, nevertheless, a valid consideration for the ALJ to rely on when assessing Middleton's credibility regarding the intensity of her alleged symptoms.  20 C.F.R. § 416.929(c)(3)(v); S.S.R. 96-7p, 1996 WL 374186, at *3 (June 6, 1996).  Furthermore, although the ALJ described the lack of objective medical evidence of body pain, noting there were "no signs of disc herniation or nerve root impingement or any neurological deficits"[26] and "no signs of muscle atrophy, indicating that she moves around in a fairly normal manner," she also noted Middleton's conservative treatment and failure to participate in a pain management program.  R. at 50.  Middleton complained of body pain in late 2011, first during an emergency room visit in September, id. at 256, and then to Middleton's treating physician, Dr. Jahan, in September and November, id. at 322, 471.  A splint was applied to her left knee at the hospital, and Ultram[27] was prescribed.  Id. at 258.  The Ultram made Middleton sick, and she was prescribed Naproxen.[28]  Id. at 322.  In her Supplemental Function Questionnaire, Middleton stated that she takes only Naproxen for her pain.  Id. at 224.

Middleton also complained of pain to Dr. Klufas in December 2011 and Dr. Waid in

---

[26]    Middleton appears to have disregarded numerous doctors' recommendations—by Dr. Donovan, id. at 385, 387, and Dr. Jaworski, id. at 429—to follow up with a neurologist.  At the ALJ hearing, Middleton testified she had just gotten a brain MRI, id. at 67, but she submitted no treatment notes regarding the results of the MRI or showing she ever saw a neurologist.

[27]    Used for the treatment of moderate to moderately severe pain following surgical procedures.  Dorland's at 1950, 1999.

[28]    A nonsteroidal anti-inflammatory drug used in the treatment of pain, inflammation, osteoarthritis, and rheumatoid arthritis.  Dorland's at 1232.

February 2012.  However, Dr. Klufas found Middleton had a full range of motion of her joints and extremities, and observed no abnormalities such as heat, swelling, redness, effusion, or thickening of any joint.  Id. at 356.  Middleton told Dr. Klufas her main problem was asthma, id. at 352, and he observed "at times, she seems to exaggerate flexion and extension of her knees demonstrating instability, but I think the rapid motions and ability to stand after squatting in a rather brisk fashion likely demonstrates that the joints are not unstable.  She had absolutely no difficulty getting on and off the examination table," id. at 356.  Dr. Waid found no supporting data for Middleton's physical pain, which he described as "exaggerations" due to either "active malingering" or a "somatization disorder."  Id. at 373.

It appears Middleton also complained of body pain to Dr. Donovan, who stated that Middleton was awaiting a diagnosis of her bone disease, and told Middleton she should consult a neurologist.  Id. at 385, 387.

The evidence shows Middleton complained to various doctors of body pain, which remained undiagnosed and primarily treated with the anti-inflammatory, Naproxen.  The ALJ found that this conservative treatment did not support Middleton's claims of disabling pain.  Id. at 50.  The ALJ fairly described Middleton's treatment as conservative, and given her alleged impairments, comparison with her minimal treatment was an appropriate basis on which to assess her credibility regarding the severity of her symptoms.  See 20 C.F.R. §§ 416.920(c)(3)(v) (treatment received must be considered when determining severity of symptoms); Garrett v. Comm'r of Soc. Sec., 274 F. App'x 159, 164 (3d Cir. 2008) (substantial evidence supported ALJ's decision where "the conservative treatment [claimant] received for her impairments indicated that they were not as debilitating as she claimed").

29

Further, the ALJ based his credibility determination on Middleton's own testimony and the reports, which showed Middleton's pain only minimially limited her functioning.  Id. at 47. The ALJ noted that despite alleging a debilitating lifestyle, Middleton admitted, and her fiancé confirmed, that "she is able to take care of her personal needs without assistance, do various household chores including cooking, cleaning, and laundry, use public transportation independently, shop for groceries and clothes, handle her own finances, read, and watch and follow television programs."  Id. at 51.  The ALJ's determination that Middleton's reported activities of daily living are inconsistent with her reported symptoms is supported by substantial evidence, and is a valid basis on which to assess Middleton's credibility.[29]  20 C.F.R. § 416.929(c)(3)(i).

Middleton also argues the ALJ failed to address her mother-in-law's credibility separately, "but merely asserts a reference to [her] in the paragraph rejecting [Middleton's] testimony."  Pl.'s Br. at 12.  However, the ALJ noted the limitations identified by Middleton's mother-in-law, R. at 48, analyzed them within the context of Middleton's own testimony and her history of medical treatment, and found Ms. Miles's testimony conflicted with the evidence, see id. at 50.  For example, the ALJ summarized Ms. Miles's testimony, noting that she saw Middleton two to three times a week, helped her with shopping, witnessed Middleton's weaknesses and falling episodes twice, as well as saw Middleton cry and shake uncontrollably on one occasion.  Id. at 48.  The ALJ found this testimony conflicted with the same evidence, discussed above, regarding a lack of objective medical evidence and the conservative nature of

---

[29]     In any event, the ALJ credited Middleton's complaints of pain by restricting her to light, simple, routine work.  R. at 47.

Middleton's treatment.  Id.

Middleton further argues the ALJ failed to address the other lay witness's credibility.  Id. The ALJ did not mention the statements of Middleton's fiancé, brother, and mother in his opinion.  All statements gave very similar accounts of Middleton's body pain, noting that she has difficulty standing, walking, and holding onto things.  They constituted cumulative evidence. Privette-James v. Colvin, No. 12-610, 2015 WL 4743769, at *2-3 (E.D. Pa. Aug. 11, 2015) (harmless error where lay witness letter that would have not affected ALJ's decision because letter details claimant's physical limitations so as to "merely reiterate" the information expressly considered elsewhere); Bailey v. Astrue, No. 07-4595, 2009 WL 577455, at *11 (E.D. Pa. Mar. 4, 2009) (harmless error where "plaintiff's mother's testimony would not have changed the ALJ's decision, as it was cumulative and merely reiterated the fact that plaintiff experienced pain which she observed when he visited her"); see also Shinseki v. Sanders, 556 U.S. 396, 406 (2009) (harmless-error rule applies to judicial review of administrative proceedings).  Because the lay witness statements do "not reveal anything new which would cause the ALJ to discount the contrary medical evidence," Bailey, 2009 WL 577455, at *11, it was harmless error.[30]

Accordingly, I make the following:

---

[30]     Furthermore, Middleton makes this argument in one sentence in the second-to-last sentence of her brief, waiving her claim.  See Pl.'s Br. at 12; Bowser v. Barnhart, 84 Fed. App'x 241, 243 (3d Cir. 2004) (claimant failed to fully argue ALJ error to district court, waiving the issue).

## **R E C O M M E N D A T I O N**

AND NOW, on December 8, 2015, it is respectfully recommended that Middleton's request for review be DENIED and judgment be entered for the Commissioner.  Middleton may file objections to this Report and Recommendation within fourteen days after being served with a copy thereof.  <u>See</u> Fed. R. Civ. P. 72.  Failure to file timely objections may constitute a waiver of any appellate rights.  <u>See</u> <u>Leyva v. Williams</u>, 504 F.3d 357, 364 (3d Cir. 2007).


BY THE COURT:


*/s/ Timothy R. Rice*
TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE